[No. 39264-6-I.   Division One.   December 22, 1997.]

The State of Washington, *Respondent*, v. Robert Rex Ross, *Appellant*.

*Eric J. Nielsen* and *James R. Dixon* of *Nielsen, Broman & Associates, P.L.L.C.*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Amy J. Freedheim, Deputy*, for respondent.

Coleman, J. — Robert Ross was convicted of vehicular homicide as a result of a single car accident in which his friend, Adam Padilla, died.[1] Ross, the only surviving witness to the accident, claims that he is unable to remember

[1] Vehicular homicide occurs:

"(1) When the death of any person ensues within three years as a proximate result of injury proximately caused by the driving of any vehicle by any person, the driver is guilty of vehicular homicide if the driver was operating a motor vehicle:

who was driving. He raises three issues on appeal. First, he claims that his statement to the responding paramedic that he was the driver of the automobile was privileged as a physician-patient communication. Second, Ross contends that the use and admission of the photographs of his dead friend were unnecessary and unduly prejudicial. Finally, Ross argues that the prosecutor's closing argument contained improper and prejudicial remarks. After a brief summary of the facts, we address each argument in turn.

Returning from a campsite during the early morning hours of July 2, 1995, defendant Robert Ross and Adam Padilla were on State Route 410 near Enumclaw when Ross's 1981 Chevrolet Camaro failed to negotiate a turn in the road. As the car left the road and rolled down a 15- to 20-foot embankment, Adam Padilla was thrown from the car, hit at least two trees, and died from massive internal injuries. The car came to rest, upside down approximately 80 feet from the road. Ross remained in the car, and after being trapped for a while, kicked open a door and crawled back up to the road.

At approximately 8:45 A.M., a passing motorist spotted Ross by the side of the road, stopped to offer assistance and reported the accident on his CB radio. A Weyerhaeuser security guard heard the CB broadcast, relayed the information by cellular phone to 911 and then drove to the accident scene. Two uniformed state troopers separately responded to the accident and each individually asked Ross who was driving. Ross repeatedly responded that he was not driving.

Once informed by Ross that another person was in the car when it crashed, the troopers climbed down the embankment and found Padilla's body at the base of a tree,

"(a) While under the influence of intoxicating liquor or any drug, as defined by RCW 46.61.502; or

"(b) In a reckless manner; or

"(c) With disregard for the safety of others."

RCW 46.61.520(1).

30 feet from the overturned car. Although, there was little external blood on Padilla, it was obvious to the troopers and a later arriving paramedic that Padilla was dead. A King County forensic pathologist estimated that Padilla died between 6:45 and 8:45 A.M.

A paramedic arrived at the scene shortly after the troopers and began treating Ross. Ross had blood all over his face and was bleeding from a cut on his cheek. The paramedic told Ross that he needed to know for treatment purposes where Ross was seated in the car. Ross stated that he was driving the car. A short while later, Ross's pulse and blood pressure dropped precipitously. In response, the paramedic contacted a doctor and began administering intravenous fluids to restore Ross's blood pressure. After being flown to Harborview hospital by helicopter, Ross was questioned by a detective while on a gurney in the X-ray portion of the hospital. During this questioning, Ross stated that he could not remember who was driving, did not think he was the driver, but admitted that it was possible that he was driving.

Roxianna Padilla, the decedent's common-law wife, testified that she telephoned Ross in the hospital and that Ross at first admitted that he was driving and that he did not know if he had swerved to miss a deer. Later in their brief conversation, Ross told Roxianna that he did not know who was driving. Barbara Padilla, the decedent's mother, telephoned Ross several weeks after the accident and testified that Ross told her that he had told the first people who stopped to help him that he had lost control of the car.

Blood samples were taken from both men and tested for the presence of alcohol. Padilla had a blood alcohol content of .23 at the time of his death. Ross had a blood alcohol content of .08 at 9:26 A.M. and with average burn-off rates, his blood alcohol content could have been approximately 0.12 at the time of the accident.

Back at the accident site, Ross's wrecked car was found upside down with the driver's door partially open. The passenger door was jammed shut, bowed outward with the

telltale signs of tremendous contact damage coming from inside the vehicle. The passenger side of the vehicle was partially embedded in the ground so that it would have been impossible for a person to exit the car from that side. Human hair, consistent with a known sample of Padilla's hair, was found stuck to the car in several places on the passenger side of the vehicle. There was an extensive amount of blood on the interior roof of the driver's side. In addition, a tennis shoe was found on the driver's side of the vehicle. Padilla was wearing sport sandals and his right sandal still contained a light coating of dirt, indicating that it had not been applying the brake or accelerator.

### Physician-Patient Privilege

Ross claims his statement to the paramedic was a privileged physician-patient communication and that the court erred in admitting the statement. Alternatively, Ross asserts that the paramedic in this case was an agent of a physician and the communication is therefore privileged. The State counters that the physician-patient privilege does not apply to statements made to independently acting paramedics and that even if the privilege did apply, Ross waived any privilege when he signed a waiver releasing his Harborview Medical Center records. We agree with the State.

We turn first to the issue of privilege and find that under the facts in this case, Ross's communication with the paramedic did not fall within the physician-patient privilege. The statutory physician-patient privilege states in part:

> [A] physician or surgeon or osteopathic physician or surgeon shall not, without the consent of his or her patient, be examined in a civil action as to any information acquired in attending such patient, which was necessary to enable him or her to prescribe or act for the patient[.]

RCW 5.60.060(4). This privilege is a procedural safeguard,

not a rule of substantive or constitutional law. *Carson v. Fine*, 123 Wn.2d 206, 212, 867 P.2d 610 (1994). While statutorily limited to civil cases, the physician-patient privilege has been extended to criminal cases pursuant to RCW 10.58.010 which applies the civil rules of evidence to criminal prosecutions as far as practicable. Washington courts have extended the privilege to criminal cases to the extent practical in balancing the benefits of the privilege in encouraging full disclosure for proper medical treatment against the public interest in full disclosure of the facts. *State v. Smith*, 84 Wn. App. 813, 820-21, 929 P.2d 1191, *review denied*, 133 Wn.2d 1005 (1997); *State v. Stark*, 66 Wn. App. 423, 438, 832 P.2d 109 (1992).

██ Furthermore, the physician-patient privilege is in derogation of common law and should therefore be strictly construed and limited to its purposes. *Carson*, 123 Wn.2d at 213. The text of the statute covers communications necessary for treatment that were made to physicians, surgeons, or osteopathic physicians or surgeons. The responding paramedic was neither a physician nor a surgeon.

██ Ross argues that the privilege should be extended to paramedics because they are highly trained and act as physician extenders. Regardless of the merit of this argument, the Legislature, not the court, has the authority to extend the literal language of the privilege to include paramedics.

██ Indeed, the Legislature has enacted privileges for a variety of other professional occupations. *See, e.g.*, RCW 5.62.020 (nurses), RCW 18.53.200 (optometrists), RCW 18.83.110 (psychologists), and RCW 5.60.060(6) (certain social workers, therapists, and other counselors). Thus, both the case law proscribing a strict interpretation and the legislatively enacted privileges for individual occupations support a literal reading and application of the physician-patient privilege. A literal reading excludes communications made to autonomously acting paramedics from the physician-patient privilege.

■ Ross asserts that his statement was nevertheless privileged because the paramedic was acting as an agent of a physician. However, the testimony of the paramedic reveals that a physician was not contacted until after Ross stated that he was the driver. Information obtained prior to a physician seeing the patient is not privileged. *State v. Cahoon*, 59 Wn. App. 606, 610-11, 799 P.2d 1191 (1990) (statement made to an emergency medical technician outside the presence of a physician is not privileged); *State v. McCoy*, 70 Wn.2d 964, 966, 425 P.2d 874 (nurses that were not acting under the direction of any physician were not covered under physician-patient privilege), *cert. denied*, 389 U.S. 873 (1967).[2] Thus, Ross's statements to the paramedic are not privileged because paramedics in general are not expressly covered by the physician-patient privilege and the paramedic in this case was not acting as the agent of a physician at the time Ross admitted being the driver.

■ Since we hold that the physician-patient privilege does not apply to independently acting paramedics, we do not need to reach the issue of waiver. However, it is undisputed that Ross signed a waiver to release his treatment-related medical records from Harborview Medical Center. The physician-patient privilege states that the privilege is waived as to all physicians or conditions if a waiver is given for one physician or condition. RCW 5.60.060(4)(b). Thus, even if the privilege did apply, Ross would be deemed to have waived the privilege with the paramedic.

We affirm.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

---

[2]In 1985, 18 years after *McCoy*, the Legislature enacted RCW 5.62.020 creating a privilege for communications made to registered nurses. LAWS OF 1985, ch. 447.

WEBSTER and ELLINGTON, JJ., concur.

Review denied at 135 Wn.2d 1011 (1998).